UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JESSICA LONG,

      Plaintiff,

v.                                                    CASE NO. 8:22-cv-1356-SDM-SPF

CHAD CHRONISTER, et al.,

      Defendant.

_____/

## **ORDER**

      Jessica Long, the personal representative of the estate of Mauricio Blanco, sues (Doc. 29)[1] Chad Chronister in his capacity as the sheriff of Hillsborough County and sues Deputy Sheriff Keith Barnes.[2] Long brings against Chronister in his official capacity a negligence claim (Count I), a battery claim (Count II), and two claims under 42 U.S.C. § 1983 for failing "to render aid" (Counts III and IV). Long brings against Barnes in his individual capacity an excessive force claim under 42 U.S.C. § 1983 (Count V). Barnes and Chronister each move (Docs. 82 and 83) for summary judgment, Long responds (Docs. 93 and 94), and both Barnes and Chronister reply (Docs. 95 and 97).

_____

[1] Long's fourth amended complaint (Doc. 29) is the operative complaint.

[2] The fourth amended complaint includes two claims (Counts VI and VII) against Naphcare, Inc. Because an earlier order (Doc. 101) dismisses each claim against Naphcare, this order discusses only Long's claims against Chronister and Barnes (Counts I–V).

## BACKGROUND

On November 24, 2018, Tampa Police Department officers arrested Mauricio

Blanco for resisting arrest with violence, for battery on a law enforcement officer,

and for possession of cannabis. (Doc. 83-1 at 6) Shortly after Blanco's booking into

the Hillsborough County Falkenberg Road Jail, medical staff placed Blanco in psy-

chiatric observation. (Doc. 83-2 at 2) On November 30, 2018, medical officials

changed Blanco's psychiatric designation and released Blanco into general popula-

tion. (Doc. 83-3 at 2) Because Blanco exhibited "unpredictable behavior" and an

"inability to cope in general population," on December 1, 2018, jail staff placed

Blanco in administrative confinement. (Doc. 83-4 at 2; Doc. 83-5 at 2) Four days

later, jail staff again released Blanco into general population. (Doc. 83-6 at 2) On

December 6, 2018, Blanco persistently beat on his cell door, screamed, and yelled.

(Doc. 83-7 at 2)

On the morning of December 8, 2018, sheriff's deputies re-located Blanco and

about 250 other prisoners from housing unit one to housing unit three. (Doc. 83-8 at

3–4) To initiate Blanco's re-location, deputies instructed Blanco to place his hands

through the cell's food slot for handcuffing. (Doc. 83-9 at 3) After several attempts

by more than one deputy, Blanco allowed Deputy Pierpont to handcuff him. (Doc.

83-10 at 4) At 9:19 a.m., deputies successfully re-located Blanco to housing unit

three. (CD 1: 9:15:22–9:19:30)[3]  After arriving in housing unit three, Blanco exhib-

ited erratic and hyperactive behavior.  For example, Blanco began beating on his cell

door, proclaiming that was the "chosen one," and threatening to kill deputies.

(Docs. 83-11 at 6 and 8; Doc. 83-12 at 5)  A deputy called Licensed Clinical Social

Worker (LSCW) Deseray Caiati to evaluate Blanco.  (Docs. 83-13 at 1–2)  At 3:41

p.m., Caiati placed Blanco on "Level 2 Psychiatric Administration," which requires

staff to check on Blanco every thirty minutes.  (Doc. 83-13 at 2; Doc. 83-14).

After his evaluation, Blanco grew more erratic, agitated, and aggressive.

(Doc. 83-10 at 8)  Blanco turned-on his sink faucet until water overflowed  (Doc. 83-

11 at 10); Blanco stood on top of the sink and attempted to break a light fixture on

the ceiling  (Doc. 83-11 at 10); Blanco repeatedly banged on his cell door  (Doc. 83-

10 at 9); and, while standing on top of his cell bunk, Blanco yelled at deputies, con-

versed with "people who weren't there," and repeatedly hit himself with a shower

slide.  (Doc. 83-8 at 5)  From 10:38 a.m. to 3:41 a.m., deputies visited Blanco's cell at

least fourteen times[4] to conduct security and well-being checks.

Because of Blanco's increasingly agitated and erratic behavior, Deputy Barnes

called LSCW Maureen Boggs and expressed concern for Blanco's safety.  (Doc. 83-

15 at 3)  To ensure that Blanco wouldn't hurt himself, Boggs placed Blanco on

---

[3] Although several video exhibits are in the record, Blanco's cell lacked a camera. Accord-
ingly, no video footage exists of the altercation that occurred within Blanco's cell or what happened
in the cell immediately after the deputies restrained Blanco.

[4] CD 5: 10:39:17; 11:01:56; 11:32:54; 12:01:46; 12:32:20; 13:06:21; 13:32:06; 14:02:19;
14:32:15; 15:04:31; 15:19:41–15:24:31; 15:33:17–15:33:53; 15:39:11–15:40:36; 15:41:58; Doc. 82-13
at 23

"Level 1-Psychiatric Administration." (Doc. 83-15 at 3–4; Doc. 83-16) Under direct psychiatric observation, an inmate is monitored throughout the day and night, retains no personal belongings, dresses in a green suicide gown, and eats only "finger food." (Doc. 84-4 at 2) Because his cell lacked a camera, Blanco's safety required the deputies to re-locate to Blanco.

Beginning at 4:18 p.m., jail staff[5] tried to calm Blanco and tried to coax him from his cell. (Doc. 82-12 at 2–4; Docs. 82-13 at 5, 88, and 111; CD 5[6]) After several failed attempts, Deputy Rosario and Deputy Avila pleaded with Blanco in Spanish. (Docs. 82-13 at 9 and 88; CD 5:16:55:10–17:03:47) Apparently experiencing hallucinations,[7] Blanco refused to cooperate. A nurse attempted to check Blanco's blood pressure and blood sugar level, but Blanco refused. (Docs. 82-13 at 9 and 87; CD 5:16:55–17:03) Concern among jail staff grew as Blanco became more erratic and irate. Blanco continuously banged against his cell window and smacked himself with a shoe. (CD 5; Docs. 82-13 at 20 and 35) Spewing invective at each deputy, Blanco threatened to "kill anyone who comes in the cell" and stated "I'm going to kill these [d]eputies." (Docs. 82-12 at 34 and 46; Docs. 83-13 at 20, 21, and 87) At

---

[5] The jail staff that attempted to calm Blanco include Deputies Avila, Baker, Barnes, Davis, Hunter, Pierpont, and Stewart, and NaphCare employees Boggs, Caiati, and Guzman.

[6] CD 5:15:42:03-16:01:47; 16:12:27-16:21:01; 16:24:50-16:29:09; 16:32:07-16:36:03; 16:42:43-6:51:52; 16:55:10- 17:03:47; 17:05:15-17:09:54; 17:11:53-17:15:08.

[7] Blanco "was generally erratic and incomprehensible and occasionally he would make something that resembled like a coherent statement like he talked about how he loved Donald Trump. Um, and so then we would try to coax him hey well we like Donald Trump over in 3 Delta, why don't you come over to 3 Delta and we'll talk about Donald Trump. And then he would go back to the hallucinations and all that other stuff." (Doc. 82-13 at 141)

- 4 -

5:25 p.m., Sgt. Luckey tried for a final time to obtain Blanco's compliance.  (Doc.

82-13 at 36; CD 5:17:25:31)  Again, Blanco refused to comply.

At 5:37 p.m., Sgt. Luckey gathered five deputies[8] and prepared to enter

Blanco's cell.  (Doc. 82-13 at 5; CD 5:37:37:32)  Standing atop his bunk, Blanco ap-

peared "amped up" and combative.  (Docs. 82-12 at 30–34; 82-13 at 36)  Sgt. Luckey

entered the cell, brandished his taser, and instructed Blanco to leave the bunk;

Blanco "never showed a sign of compliance."  (Doc. 82-12 at 30; Docs. 82-13 at 46,

52, and 89)  Sgt. Luckey holstered his taser and stepped toward Blanco.  Jumping

from his bunk, Blanco hurled a "flying superman punch" at Sgt. Luckey.  (Doc. 82-

12 at 33; Docs. 82-13 at 16, 37, and 110)  Sgt. Luckey deflected Blanco's fist, which

struck Deputy Barnes's face.  (Doc. 82-12 at 33)  Deputy Barnes wrestled Blanco to

the ground.  (Docs. 82-12 at 32; 82-13 at 37)  From a supine position with his legs

planted on the floor and his back pinned against his bunk, Blanco hurled punches at

each deputy who tried to secure him.  (Doc. 83-8 at 12)  After a struggle, the deputies

rolled Blanco prone, but Blanco began "doing push-ups with the [deputies] on top of

him."  (Doc. 82-13 at 39 and 48)

Six deputies struggled for several minutes to restrain Blanco.  Deputy Hunter

held Blanco's left leg (Docs. 82-12 at 35); Deputy Stewart and Deputy Pierpont held

Blanco's right arm (Docs. 82-12 at 36); Deputy Avila held Blanco's left arm (Doc.

82-13 at 7); Sgt. Luckey held Blanco's legs (Doc. 82-12 at 30); and Deputy Barnes

---

[8] Along with Sgt. Luckey, deputies Avila, Baker, Barnes, Pierpont, and Stewart entered the
cell to extract Blanco.

restrained Blanco's upper torso in a three-point pin.[9]  (Docs. 82-12 at 33; 82-13 at 55–56, 59, 74, and 90)  Because of Blanco's attempting to bite and spit on the deputies, Deputy Barnes placed a spit mask around Blanco's head.  (Doc. 82-12 at 30; Docs. 82-13 at 10, 49, 90, 96–97)  During the struggle, none of the deputies except Deputy Avila heard Blanco complain about a specific injury or discomfort.  (Doc. 82-13 at 6, 7, 10, 11, and 12)  Deputy Avila testified that  Blanco "maybe" said "something about breathing."  (Doc. 83-19 at 18; Doc. 82-13 at 7)  Either in response to Blanco's complaining or from caution, Sergeant Luckey instructed Barnes to ensure that his leg was not blocking Blanco's airway.  (Docs. 82-13 at 7, 8, 55–56, 59, 74, 81)  Barnes confirmed that he was not obstructing Blanco's airway.  (Doc. 83-11 at 20; Docs. 82-13 at 53, 54, 212–13, 218, 276, 295–296, 319–20)  Eventually, a deputy placed Blanco's hands in cuffs and a deputy bound Blanco's legs in restraints.

Immediately after restraining him, a few deputies continued to hold Blanco. More than one deputy heard Blanco breathing and making noise.  (Doc. 83-13 at 49–50)  While Blanco remained flat on the floor in a prone position, Sgt. Luckey spoke on the phone with LSCW Boggs and requested an Emergency Treatment Order (ETO).[10]  (Doc. 82-13 at 197)  LSCW Boggs informed Sgt. Luckey that ETOs are not typically administered to inmates that attack staff but stated that she would submit an ETO request.  Deciding to transport Blanco without an ETO, Sgt. Luckey

---

[9] Barnes placed his left leg over Blanco's should and across the side of his face.  (Doc. 83-11 at 15)

[10] An Emergency Treatment Order is an injection used to calm an inmate that might harm others or himself. (Doc. 82-13 at 89 and 179)

instructed Deputy Hunter to request an EMT, instructed Deputy Baker to bring a re-straint chair, and instructed the other deputies to sit Blanco upright. (Doc. 82-13 at 41) Sgt. Luckey checked Blanco's carotid artery. After "fe[eling] what appeared to be a pulse," Sgt. Luckey instructed Deputy Barnes and Deputy Avila to place Blanco in the restraint chair. (Docs. 82-13 at 41 and 51) Deputy Barnes and Deputy Avila stood Blanco up and placed Blanco in the restraint chair; Blanco assisted the deputies by carrying some of his own weight. (Docs. 82-13 at 96 and 98) Sgt. Luckey again checked Blanco's carotid artery and again found a pulse. (Docs. 82-13 at 93 and 96)

At approximately 5:52 p.m., Sgt. Luckey and a few deputies wheeled Blanco from cell 302 to the "tower" or "queuing area." (Doc. 82-13 at 41 and 109; CD 5: 17:52:56) While transporting Blanco down the hall toward the queuing area (CD 6:17:53:41–17:53:59), Sgt. Luckey heard Blanco breathing (Docs. 82-13 at 42 and 44), Deputy Hunter saw Blanco's chest rise (Doc. 82-13 at 71), and Deputy Avila thought he found Blanco's pulse (Docs. 82-13 at 81 and 82). Hearing "less noise" from Blanco than before, the deputies stopped at the "officer's station," which is just outside the queuing area. (Doc. 82-13 at 42) Sgt. Luckey instructed Deputy Baker to check EMT Smith's location and again checked Blanco's pulse. (Doc. 82-13 at 42) Sgt. Luckey could not determine whether Blanco had a pulse but heard Blanco breathe deeply. (Doc. 82-13 at 42)

At 5:54 p.m., the deputies wheeled Blanco into the queuing area and met EMT Smith. (CD 7: 17:54:03) Sgt. Luckey immediately asked EMT Smith to check Blanco's vitals. (Docs. 82-13 at 42 and 85) Knowing that Blanco was a diabetic,

- 7 -

Smith first checked Blanco's blood sugar.  (Doc. 82-13 at 62)  While Smith checked Blanco's blood sugar, Deputy Stewart partially removed Blanco's spit mask and informed Sgt. Luckey that Blanco apparently was not breathing.  (Doc. 82-13 at 57)  Sgt. Luckey again requested Smith to check Blanco's vitals.  (Doc. 82-13 at 42 and 58)  Smith could not feel Blanco's pulse.  (Doc. 82-13 at 42)  Sgt. Luckey instructed deputies to remove Blanco from the restraint chair, and Deputy Stewart announced a "Signal 68."[11]  (Doc. 82-12 at 31)  Deputies removed Blanco's restraints and moved him to the floor.  (CD 7:17:57:05)  From 5:57 p.m. through 6:09 p.m., medical personnel attempted to resuscitate Blanco.  (Doc. 82-12 at 3)

Hillsborough County Fire Rescue (HCFR) arrived at 6:09 p.m. and rendered aid to Blanco.  (CD 7)  HCFR twice brought back Blanco's pulse.  (Doc. 82-13 at 13)  At 6:37 p.m., HCFR delivered Blanco to an ambulance, which transported Blanco to Brandon Regional Hospital.  At 7:23 p.m., Dr. Frederick Schiebel pronounced Blanco dead.  (Doc. 82-13 at 14)

## DISCUSSION

### I. Count V: Excessive Force against Deputy Barnes

In Count V, Long brings against Barnes an excessive force claim under 42 U.S.C. § 1983.[12]  Arguing that he is entitled to qualified immunity, Barnes moves

---

[11] A "Signal 68" indicates a non-breathing inmate. (Doc. 8-13 at 51)

[12] As noted in Barnes's motion for summary judgment (Doc. 82 at 14 n. 21), Count V of Long's fourth amended complaint (Doc. 29 at 54), which is entitled "Violation of 42 U.S.C. § 1983 for Use of Excessive Force," includes the following language: "[a]s a direct and proximate cause of Defendant Barnes'[s] deliberate indifference, Mr. Blanco suffered harm in violation of his right to be
(continued…)

(Doc. 82) for summary judgment. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects all officials except "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 353, 341 (1986).

To invoke qualified immunity, a public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). Long accepts that Barnes acted within his discretionary authority. "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. To defeat Barnes's qualified immunity, Long must (1) allege facts that state a constitutional violation and (2) prove that the act violating the constitutional right was "clearly established" as unconstitutional at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007).

### A. Long fails to establish that Barnes used excessive force against Blanco

When "addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the

---

free from cruel and unusual punishment and due process rights." Despite this language, Long fails to allege the basic elements of a deliberate indifference claim.

challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Long

alleges that Barnes "violated Mr. Blanco's rights under the Eighth and Fourteenth

Amendments . . . ." (Doc. 29 ¶171) The Eight Amendment's Cruel and Unusual

Punishments Clause applies only to a convicted prisoner. Blanco was a pretrial de-

tainee, and "pretrial detainees (unlike convicted prisoners) cannot be punished at

all." *Kingsly*, 576 at 389. Therefore, Blanco can bring an excessive force claim under

the Fourteenth Amendment only.[13]

    To establish an excessive-force claim under the Fourteenth Amendment, "a

pretrial detainee must show only that the force purposely or knowingly used against

him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97

(2015). "[O]bjective reasonableness turns on the 'facts and circumstances of each

particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386,

396 (1989)). The reasonableness of a use of force depends on "the perspective of a

reasonable office on the scene, including what the officer knew at the time, not with

the 20/20 vision of hindsight," with recognition of "the government's need to man-

age the facility where an individual is detained," and with deference "to policies and

practices that jail officers believe are needed to preserve order, discipline, and

---

    [13] Although the Fourth, Eighth, and Fourteenth Amendment prohibit the use of excessive
force, the nature of each claim differs. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015) (distin-
guishing an excessive force claim brought under the Eight Amendment's Cruel and Unusual Punish-
ment's Clause from an excessive force claim brought under the Fourteenth Amendment's Due Pro-
cess Clause); *See also Crocker v. Beatty*, 995 F.3d 1232, 1246 (11th Cir. 2021) ("So, under the Supreme
Court's current framework, the Fourth Amendment covers arrestees, the Eighth Amendment covers
prisoners, and the Fourteenth Amendment covers those who exist in the in-between—pretrial detain-
ees.") (internal quotation and citations omitted).

security." *Kingsley*, 576 U.S. at 397. Illustrative considerations that bear on the rea-

sonableness of the force used include:

> [1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397.  Because "the appropriate standard for a pretrial detainee's

excessive force claim is solely an objective one," an analysis of these considerations

must disregard an officer's subjective intent or motivation.  *Kingsley*, 576 U.S. at 396–

97.

Blanco presented a severe security threat to himself and to each deputy.

Blanco's erratic, destructive, and bizarre behavior — such as Blanco's continuously

beating on his cell door, proclaiming that he is the "chosen one," flooding his cell,

and hitting himself with a shower slide — prompted LSCW Boggs to designate

Blanco to "Level 1-Psychiatric Administration," which required the deputies to re-

locate Blanco.  Several deputies pleaded with Blanco (in English and Spanish) to

comply with his re-location; the deputies entered his cell only after Blanco repeatedly

refused.  Barnes, along with every other deputy, reasonably perceived Blanco as a

threat.  In fact, Blanco expressly threatened to kill anyone who entered his cell.  After

the deputies entered Blanco's cell, Blanco lunged at Sgt. Luckey, struck Deputy

Barnes with a flying haymaker, and hurled strikes at each deputy.  Through their

combined efforts, the deputies managed to turn Blanco prone.  Refusing to comply,

Blanco thrashed on the floor, spit and bit at deputies, and even started doing push-ups with the deputies on top of him.  To counter Blanco's force and neutralize Blanco's resisting, Deputy Barnes pinned Blanco's upper-torso to the floor and applied a spit mask.  After minutes of struggle, the deputies managed to restrain Blanco's hands and legs in binder chains.  Long does not dispute that Barnes used justified and reasonable force to restrain Blanco.

Rather, Long argues that a material dispute of fact exists as to the reasonableness of force used by Barnes in the moments immediately after Blanco was restrained.  (Doc. 94 at 6)  Specifically, Long contends that, after the deputies restrained Blanco, Barnes's "continued pressure on Blanco's back, neck, and face was excessive and unnecessary."  (Doc. 94 at 6)  Without citing the record, Long concludes:

> [d]espite Mr. Blanco being clearly placed in shackles and unable to harm any other . . . officers in his cell, Defendant Barnes continued to apply pressure along Mr. Blanco's shoulders and neck until just before Sgt. Luckey ordered Mr. Blanco to be carried out of his cell and placed into a restraint chair."

(Doc. 94 at 4)

Contrary to Long's assertion that Barnes applied pressure "until just before" the deputies placed Blanco in the restraint chair, the record shows that the deputies rolled Blanco over, sat Blanco upright, and checked Blanco's pulse.  (Doc. 83-11 at 17; 82-13 at 41)  Neither party disputes that during the skirmish Barnes placed Blanco in a three-point pin.  Barnes testified that after securing a spit mask around Blanco's head, Barnes ceased applying against

Blanco his full body weight and applied only enough pressure to "keep [Blanco] from struggling."[14]  (Doc. 83-11 at 17)

Viewing the facts most favorably to Long, Barnes continued to hold Blanco down after Blanco was restrained and incapable of harming a deputy.[15] Even assuming that Barnes's continued application of force was unnecessary, the force applied by Barnes was *de minimis*.[16]  *See Nolin v. Isbell*, 207 F.3d 1253, 1256–57 (11th Cir. 2000) (holding that qualified immunity shields officers where "the use of force against [the plaintiff] may have been unnecessary" but "the actual force used and the injury inflicted were both minor in nature.") (quoting *Jones v. City of Dothan*, 121 F.3d 1456, 1460–61 (11th Cir. 1997)) (alteration in the original).  Long cites no evidence that, after Blanco was restrained, Barnes's holding Blanco down caused Blanco an injury, much less caused Blanco's death.  The record evidence establishes that atherosclerotic

---

[14] Barnes's testimony is supported by the testimony of Sgt. Luckey and Sgt. Hunter. Sgt. Luckey testified that immediately after the deputies restrained Blanco, he began conversing over the phone with LSCW Boggs.  (Doc. 94-9 at 31) While on the phone, Sgt. Luckey observed that Blanco "was still loud" and that the "deputies are more so at this point holding onto him."  (Doc. 94-9 at 31) Sgt. Hunter testified that, after Blanco was restrained and lying on the ground, he "never saw another deputy directly on top of him . . . they were holding him down." (Doc. 82-13 at 69)

[15] Whether Blanco continued resisting and struggling after the deputies placed him in restraints is disputed.  *See* Doc. 82 at 8 ("Even after leg-restraints were applied, Blanco was still moving, requiring Sgt. Luckey to hold Blanco's legs and Deputy Barnes to leave his leg across Blanco's shoulders.")

[16] Because "the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment," the *de minimis* principle applies in the Fourteenth Amendment context. *Crocker v. Beatty*, 995 F.3d 1232, 1253–1253 (11th Cir. 2021).

and hypertensive cardiovascular disease primarily caused Blanco's death[17] and

that Blanco's manner of death was "[n]atural." (Doc. 82-9 at 13) Accord-

ingly, Long fails to establish that Barnes used excessive force.

### B. Long fails to show that existing precedent (or any other legal principle) places "beyond debate" the constitutionality of Barnes's force

As explained above, Long fails to establish that Barnes's use of force

was excessive, which entitles Barnes to qualified immunity. But even if Long

showed that Barnes used excessive force, Long must show that his rights were

clearly established. A right is clearly established when "the state of the law

g[ives] the [defendants] fair warning that their alleged conduct [is] unconstitu-

tional." *Caldwell v. Warden, FCI Talladega*, 748 F.3d at 1090, 1102 (11th Cir.

2014) (second alteration in the original) (quoting *Cottone v. Jenne*, 326 F.3d

1352, 1359 (11th Cir. 2003)).

Long can demonstrate a "clearly established" right in several ways.

First, precedent from the United States Supreme Court, the Eleventh Circuit,

or the Florida Supreme Court must place the constitutional question "beyond

debate." *Patel v. Lanier County Georgia*, 969 F.3d 1173, 1186 (11th Cir. 2020)

(quoting *J W ex rel. v. Williams v. Birmingham Bd. Of Educ.*, 904 F.3d 1248,

1259–60 (11th Cir. 2018)). Second, Long "can identify a broader, clearly

_____

[17] The medical examiner includes as contributing causes of death a "psychotic episode with excited delirium of unknown etiology with self harm necessitating restraint" and "chronic cocaine abuse." (Doc. 82-9 at 13)

established principle that should govern the novel facts of the situation." *J W ex rel.*, 904 F.3d at 1259–60.  Third, Long can show that "the conduct at issue so obviously violated the Constitution that prior case law is unnecessary." *J W ex rel.*, 904 F.3d at 1259–60.

Long fails to show that the alleged violation of Blanco's constitutional rights was "clearly established" at the time of the incident.  Without citing any precedent, Long argues that "the right to be free from excessive force and the right to receive adequate medical care are clearly established." (Doc. 94 at 7)  But no precedent or legal principle establishes "beyond debate" that Barnes's actions amounted to excessive force.  In fact, a review of the relevant case law shows Barnes's use of force was objectively reasonable.

In *Ireland v. Prummell*, 54 F.4th 1274 (11th Cir. 2022), a pretrial detainee, Greg Ireland, died while incarcerated, and his estate brought a Section 1983 action against corrections officers for using excessive force.  After a physical altercation between Ireland and his cellmate, Officer Swartzentruber attempted to re-locate Ireland's cellmate.  Swartzentruber entered Ireland's cell and asked Ireland to move toward the rear of the cell and to have a seat.  Ireland repeatedly refused Swartzentruber's commands and, when an officer entered the cell to grab the cellmate's belongings, Ireland tensed and took a step toward Swartzentruber, who deployed his taser, called for backup, and tased Ireland.  Other officers arrived and a fight ensued.  Because of Ireland's resisting — Ireland's biting, spitting, and kicking — officers struck Ireland several

times, sat on top of Ireland's back, pinned Ireland's head to the floor, shackled Ireland's legs, tased Ireland nine times, applied a spit mask around Ireland's head, and placed Ireland in handcuffs. After Ireland was finally restrained, the officers moved Ireland to a second cell (where the camera did not work) and moved again to a third cell for observation. At some point during these re-locations, Ireland lost consciousness. After transporting Ireland to the third cell, an officer requested EMS support and performed on CPR on Ireland. EMS arrived and transported Ireland to the hospital. Less than a day later, Ireland died.

Applying the *Kingsley* factors, the Eleventh Circuit determined that the officers' actions were objectively reasonable (and justified) because the need for force was apparent, because Ireland failed to comply with verbal commands, because Ireland acted aggressively toward the officers, and because the evidence showed neither that the officers' physical force nor the taser caused Ireland's death. *Ireland*, 53 4th at 1301.

As in *Ireland*, Barnes's actions were objectively reasonable because the need to use force was apparent, because Blanco refused to comply with the deputies' commands, because Blanco aggressively resisted and attacked officers, and because no evidence supports that Barnes's use of force caused Blanco's death. Although Barnes continued to hold Blanco down after Blanco's arms and legs were restrained, Blanco was still capable of harming himself. No reasonable officer, enduring the same physical resistance that

- 16 -

Barnes endured, would have understood that the force Barnes employed violated Blanco's constitutional rights. *See Mann*, F.3d at 1300, 1306 ("Whether the use of force was reasonable must be determined 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'") (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Even if Barnes's actions violated a constitutional right, Blanco's estate has not shown that existing precedent (or any other legal principle) places "beyond debate" the constitutionality of Barnes's force. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Accordingly, Barnes is entitled to qualified immunity.

## II. Counts III and IV: Deliberate Indifference against Sheriff Chronister in his official capacity

Long brings against Sheriff Chronister in his official capacity[18] two claims under 42 U.S.C. § 1983 for "failing to render aid." Long contends that while acting under a Hillsborough County Sheriff's Office custom or policy, Chronister and his

---

[18] Long's Section 1983 claims against Sheriff Chronister in his official capacity are effectively claims against the Hillsborough County Sheriff's Office. *See Monell v. Department of Social Services*, 436 U.S. 658, 690 n.55 (1978) (explaining that "official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"); *see also Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005) (holding that under Florida law a suit against a county sheriff in his official capacity is "effectively a suit against the governmental entity he represents").

agents violated Blanco's Fourteenth Amendment right[19] to adequate medical care.[20]
Although permitted to sue a municipality under Section 1983, Long may not rely on
a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs.* 436 U.S. 658, 691 (1978)
("a local government may not be sued under § 1983 for an injury inflicted solely by
its employees or agents"); *see also McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir.
2004). Instead, Long must show "(1) that [Blanco's] constitutional rights were vio-
lated; (2) that [Hillsborough County] had a custom or policy that constituted deliber-
ate indifference to that constitutional right; and (3) that the policy or custom caused
the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

### A. Long fails to establish a constitutional violation

Long fails to establish that Blanco's constitutional rights were violated. As ex-
plained above, Long fails to establish that Barnes's actions amounted to excessive
force. Similarly, Long fails to establish that the actions of Barnes (or any other per-
son) amounted to deliberate indifference.

To prevail on a deliberate indifference claim, Long must prove that (1) Blanco
had an objectively serious medical need; (2) the defendants acted with subjective

---

[19] In Counts III and IV, Long alleges that Chronister violated Blanco's "Eight Amendment
right to be free from cruel and unusual punishment" and Blanco's "Fourteenth Amendment due pro-
cess rights." Because Blanco was a pre-trial detainee (and not a convicted prisoner), only the Four-
teenth Amendment applies. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009) ("As a
pre-trial detainee, [Blanco]'s rights exist[ed] under the due process clause of the Fourteenth Amend-
ment rather than the Eight Amendment . . . . Nonetheless, [Blanco]'s claims are subject to the same
scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amend-
ment.") (internal citation omitted).

[20] "The Fourteenth Amendment requires government officials to provide basic necessities,
including medical care, to pretrial detainees." *Ireland v. Prummell*, 53 F.4th 1274, 1287 (11th Cir.
2022) (citing *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1574 (11th Cir. 1985)).

deliberate indifference; and (3) that the defendant's wrongful conduct caused or worsened Blanco's condition. *See Patel v. Lanier County Georgia*, 969 F.3d 1173, 1188 (11th Cir. 2020). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019), and, in either instance, "that, if left unattended, poses a substantial risk of serious harm." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).

A defendant is deliberately indifferent to a plaintiff's serious medical needs when the defendant (1) has subjective knowledge of a risk of serious harm; (2) disregards that risk; and (3) acts with subjective recklessness as used in the criminal law. *See Patel*, 969 F.3d at 1188; *See also Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024).[21] Subjective recklessness requires a showing that the defendants "were actually, subjectively aware that [their] own conduct caused a substantial risk of serious harm to the plaintiff." *Wade*, 106 F.4th at 1262. However, even if a defendant "actually knew of a substantial risk to inmate health or safety," the defendant cannot "be found liable under the [Fourteenth Amendment's Due Process Clause] if the

---

[21] *Wade* addresses the tension within Eleventh Circuit precedent regarding the minimum culpability required under the deliberate-indifference standard. One line of cases notes that "a claim of deliberate indifference requires proof of more than gross negligence," e.g., *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010), while another uses the phrase "more than mere negligence," e.g., *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Clarifying this ambiguity, *Wade* holds that "subjective recklessness as used in criminal law" is the minimum culpability required under the deliberate-indifference standard.

defendant "responded reasonably to the risk." *Wade*, 106 F.4th at 1262 (quoting *Farmer v Brennan*, 511 U.S. 825, 844–45 (1994)).

Even if Long could establish that Blanco had a serious medical condition, which Chronister disputes, Chronister argues that "there is absolutely no evidence that either Sheriff Chronister, his deputies, or Co-Defendant NaphCare, Inc., were 'deliberately indifferent' to that condition." (Doc. 83 at 22)   In fact, the uncontroverted evidence establishes that Blanco received adequate health care at the Hillsborough County jail.  The testimony of several experts supports Chronister's argument.  After reviewing Blanco's medical records, Dr. Andrew Doorey opined that "the medical care and attention" that Blanco received while incarcerated "was superb," that Blanco's care "exceeded what we find in most acute care hospitals," and that Long's asserting that jail staff ignored Blanco's medical needs is "without any foundation." (Doc. 83-29 at 3)  Correctional physician Dr. Randall Stoltz determined that the medical staff's assessment and treatment of Blanco at the Hillsborough County jail was within the appropriate standard of care.  (Doc. 83-30 at 6) S. Scott Keithley, a patient care physician and former EMT, similarly opined that medical staff at the Hillsborough County jail provided Blanco "appropriate and timely medical care."  (Doc. 83-31 at 2)  Finally, Dr. Kim Klancke, a board-certified cardiologist and internist, opined that "Mr. Blan[c]o's Internal Medicine and Cardiology medical care wile incarcerated in the Hillsborough County jail was appropriate and within the standard of care."  (Doc. 83-25 at 2)

- 20 -

In response, Long argues that a genuine dispute exists as to whether the deputies conduct constitutes deliberate indifference.  Specifically, Long contends that the deputies "knew that Blanco was not breathing," "failed to take any action to resuscitate him for more than [ten] minutes," and "collective[ly] dec[ided] not to provide CPR when Blanco appeared to stop breathing."  (Doc. 93 at 7–8)  Notably, Long does not cite or otherwise produce any expert evidence — not a single deposition, affidavit, or the like — to support the notion that Blanco received inadequate care or that the officers' actions caused Blanco's death.  Instead, Long argues (without a specific citation to the record) that each of the deputies noted that "Blanco became completely silent after he was shackled." (Doc. 93 at 5)

Long's argument is unsupported, speculative, and conclusory.  A review of the record shows that none of the deputies acted with subjective recklessness.  Nothing in the record supports the notion that any deputy "actually knew" that Blanco could not breathe or that their failing to immediately administer CPR created a "substantial risk of serious harm."  And even if the deputies in fact understood the severity of Blanco's condition, the deputies "responded reasonably to the risk."

After the deputies restrained Blanco, Sgt. Luckey immediately spoke with a nurse (Doc. 82-13 at 197), ordered Deputy Hunter to request an EMT (82-13 at 41), and instructed Deputy Baker to bring a restraint chair (Doc. 82-13 at 41).  While Sgt. Luckey spoke with LSCW Boggs, more than one deputy heard Blanco breathing and making noise  (Doc. 83-13 at 49–50).  Before placing Blanco in the restraint chair, Sgt. Luckey checked Blanco's carotid artery and felt what "appeared to be a pulse."

- 21 -

(Doc. 82-13 at 41)  Deputy Barnes testified that Blanco helped support his own

weight while the deputies moved Blanco from the floor and into the restraint chair.[22]

(Doc. 82-13 at 96 and 98)  And while transporting Blanco from cell 302 to the "queu-

ing area," Sgt. Luckey heard Blanco breathe (Docs. 82-13 at 42 and 44), Deputy

Hunter saw Blanco's chest rise (Doc. 82-13 at 71), and Deputy Avila thought he

found Blanco's pulse (Docs. 82-13 at 81–82).  Not until the deputies arrived just out-

side the officer's station did Sgt. Luckey doubt whether Blanco had a pulse; even

then, Sgt. Luckey heard Blanco breathe deeply.  (Doc. 82-13 at 42)  The record un-

disputably establishes that none of the deputies' actions amount to deliberate indiffer-

ence and that Long fails to show otherwise.  Accordingly, Chronister is entitled to

summary judgment on Counts III and IV.

### B. Long fails to establish a custom, policy, or practice of deliberate indif-ference

Even if Long established that a constitutional violation occurred, Long fails to

establish a custom, policy, or practice of deliberate indifference.  A "policy" is "a

course of action consciously chosen from among various alternatives . . ." and a

"custom" as a "persistent," "widespread," "permanent," and "well-settled" practice,

including "deeply embedded traditional ways of carrying out policy."  *Sewell v. Town*

*of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997).  A "custom" is "a practice that

---

[22] Sgt. Stewart testified that Blanco "was kind of limp," but that the deputies did not "know
if [Blanco] was playing or if he was being serious . . . ."  (Doc. 82-13 at 56) Blanco has a history of
"playing possum," which apparently influenced how several deputies perceived Blanco's condition.
(Docs. 82-13 at 41, 99–100)

- 22 -

is so settled and permanent that it takes on the force of law." *Sewell*, 117 F.3d at 489. A policy is "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell*, 117 F.3d at 489. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability" on a governmental entity as part of either a policy or custom unless the challenged policy itself is unconstitutional. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

In the fourth-amended complaint, Long alleges that the Hillsborough County Sheriff's Office has a history and culture of "widespread and longstanding abuse and deliberately indifferent treatment through the conduct of its agents" and "of not holding accountable those responsible for the mistreatment and abuses leading to serious injury or death of inmates." (Doc. 29 ¶¶ 152, 152, 164, 165)  In his motion for summary judgment, Chronister argues that Long "has failed to adduce any evidence to establish [that these] allegation[s] are true," and that "such proof is necessary to prevent the imposition of liability on an isolated incident."  (Doc. 83 at 20)  Under Rule 56, Federal Rules of Civil Procedure, Long must "go beyond the pleadings and submit affidavits, depositions, answers to interrogatories, or admissions that designate specific facts indicating there is a genuine issue for trial." *Celotex Corp v. Catrett*, 477 U.S. 317, 324–25 (1986).  In her response, Long fails to produce or otherwise cite any record evidence of a Hillsborough County Sheriff's Office policy, custom, or practice of deliberate indifference.  Because Long has failed to sufficiently show a

custom, policy, or practice of deliberate indifference, Chronister is entitled to summary judgment on Counts III and IV.

### III. Counts I and II: State law claims against Sheriff Chronister

Long alleges against Chronister in his official capacity a claim for negligence (Count I) and a claim for "unnecessary/excessive force constituting battery" (Count II). The defendants removed this action from state court (Doc. 1 at 2), which invoked federal jurisdiction because the complaint includes claims under Section 1983 for an alleged violation of constitutional rights. *See* 28 U.S.C. § 1331. Because each state law claim relies on the same facts as the federal claims, the exercise of supplemental jurisdiction under 28 U.S.C. § 1367 is permissible. However, each of these claims arise under Florida law and belong in a Florida court. *Vibe Micro, Inc., v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018) (stating that if a state-law claim remains after an order dismisses every federal claim, an order should "typically" dismiss the state-law claim "without prejudice as to refiling in state court"). Although Chronister argues for summary judgment on each state law claim, Long fails to respond to those arguments. In any event, under Florida law, a jury decides "[w]hether a police officer used excessive force." *Wright v. State*, 705 So. 2d 102, 105 (Fla. 4th DCA 1998). Also, "judicial economy, convenience, fairness, and comity" counsel remanding the remaining state law claims to state court. Because "no federal claim survives summary judgment, the [C]ourt sees no reason why the other claims should not be [remanded]." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

- 24 -

## CONCLUSION

Despite drawing all legitimate inferences most favorably to Long, no reasonable juror could conclude that the defendants violated the Fourteenth Amendment by using excessive force or by exhibiting deliberate indifference.  Because the defendants are entitled to summary judgment on the federal claims, the exercise of supplemental jurisdiction is declined.

Accordingly, Chronister's motion (Doc. 83) for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**, and Barnes's motion (Doc. 82) for summary judgment is **GRANTED**.  The clerk is directed to **ENTER** a judgment in favor of the defendants on Counts III, IV, and V.  Supplemental jurisdiction is **DE-CLINED**, and the action is **REMANDED** to the Circuit Court of the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida.  The clerk must transmit a certified copy of this order to the clerk of that court, **TERMINATE** any pending motions and deadlines, and **CLOSE** this case.

ORDERED in Tampa, Florida, on July 22, 2025.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE